No. 3691

Second Circuit

EDWARDS ET AL. v. STANDARD GIN & MFG. CO.

(December 31, 1929. Opinion and Decree.)

Munholland & Munholland, of Monroe, attorneys for plaintiffs, appellants.

Theus, Grisham & Davis, of Monroe, and Thornton, Gist & Richey, of Alexandria, attorneys for defendant, appellee.

ODOM, J. Sullivan Edwards, a carpenter by trade, was employed by the Standard Gin & Manufacturing Company to construct a small frame building, and while at work in the course of his employment was killed by an explosion on October 5, 1927. He had never been married and left at his death a father, a mother and two sisters. The father and the mother bring this suit for compensation under the Workmen's Compensation laws of the State, as amended by Act 85 of 1926, alleging dependency.

The defense is that the parents were not actually dependent for support in part or in whole upon their deceased son at the time of his injury and death and that he did not in fact contribute to their support. Their demands were rejected by the lower court and they have appealed.

## OPINION

Under Section 8, Act 85 of 1926, which is applicable to this case, certain persons named therein are entitled to compensation in case of the death of an employee if such persons were actually dependent either in whole or in part upon his earnings for support at the time of his death. Plaintiffs alleged that they were wholly

dependent upon their son for maintenance and support, and the burden was upon them to make good that allegation. The act provides that certain persons named are conclusively presumed to be wholly and actually dependent upon the deceased employee, but there is no such presumption in favor of surviving parents and the act provides that in all cases where there is no presumption of dependency "the question of legal and actual dependency in whole or in part, shall be determined in accordance with the facts as they may be at the time of the accident and death." Section 8, subd. 2(D).

The plaintiffs failed to discharge the burden laid upon them under the law of proving dependency. The testimony on this point shows that the parents at the time of the son's death were each about 72 years of age, and were not able to work as they once could; but neither was shown to be disabled. The mother was still doing her housework, and the father did odd jobs as carpenter, from which he earned something, but the amount was not stated. They are not in debt, own thirty-one acres of land in a rural section, with a residence upon it in which they live, a portion of it being occupied by a daughter and a son-in-law who pay rent at $5 per month. The father testified that he received $375 from the sale of land in 1926, and a statement filed in evidence, which he said was correct, shows that he received $317 from the sale of land in 1927. However, it may be that he was mistaken when he said he received $375 in 1926, and that this amount was received in 1927, for the same statement shows receipt of $200 from the sale of land in 1926. He testified that he received $375 from the land in 1927, but did not state on what date it was received. But, assuming that he received it at the beginning of the year, he had from that source for that year, up to the date of the son's death, about $42 per month. If he received the $375 later in the year, he must have had some money on hand at the time of his son's death, unless it be that he spent more money than would seem to be necessary to maintain himself and his wife. Adding to the amount which he received for the land the $5 per month which he received from his son-in-law for house rent, and adding the amounts which he earned from his own labor, and considering the fact that the couple lived in their own house in a rural section, with no outside expenses such as doctor's and medical bills, and no one dependent upon them for support, it seems that the revenues which they admittedly received are sufficient to maintain them.

The statement filed by the father shows that he had been regularly receiving an income from the sale of timber and mineral leases for quite a number of years. There is no evidence to show just what amount was necessary to sustain this couple, nor is there any evidence to show that they could not live comfortably on the revenues which they received. But, considering all the testimony and taking into consideration all the circumstances, we are satisfied that they could easily maintain themselves without the assistance of the son. From the evidence, it is perfectly clear that, as a matter of fact, they had lived for a period of at least two years without his assistance. In reaching this conclusion, we have not overlooked the testimony of the mother that her son had given her provisions in 1927 valued at $35, and provisions in 1926, amounting to $52.00. Our conclusion is that she was mistaken in this and we base our conclusion upon her own testimony hereafter quoted.

She testified that over a period of 10

years preceding her son's death he had contributed to her a total sum of $1,183, and she attaches an itemized statement showing the amount received each year. But she states that this statement is made up from memory. She further stated that during all those years she kept a little book in which she set down each year the amount received and the date on which it was received, but that very recently she had lost or destroyed the book and was, therefore, unable to produce it at the trial. In reaching the conclusion that the son did not in fact contribute anything to his parents during the two years preceding his death, we do not attribute to Mrs. Edwards any desire or intent to impose upon the court, but rather to a faulty memory. The son had unquestionably contributed something to the support of his parents in former years. He at one time lived with them, but at the time of his death, and for more than two years prior thereto, he had lived in Monroe and was not a member of their family. His health had failed and he could do but little work, and not only that, he had considerable outside expense in the way of medical bills.

Mr. Austin, for whom he was working and who operated a gin and plantations, testified that for quite a period of time prior to his death Edwards did but little work and none, so far as he knew, except for him, and no one else knew of any work Edwards had done, except for Austin. Mr. Anding, his brother-in-law, said Edwards had done work for others, but when cross-examined, admitted that he recalled none during the past two or three years. Mr. Austin testified that he advanced Edwards money from time to time to pay his board and doctor's bills with the understanding always that when he (Austin) had work to do, Edwards would do it and get credit for his wages on the sums advanced. The record leaves the decided impression that for two or three years prior to his death, Edwards was barely able to maintain himself. Aside from this, it was conclusively proved that the father and the mother each stated after their son's death that his health had failed and that he had made no contributions to them within the past two years.

On October 11th, four days after the son's death, Mr. Villiva and Mr. Clark, claim adjusters for the insurer of defendant, visited the father and mother at their home near Swartz where they interviewed them on the particular point whether their son had been contributing to their support. Villiva and Clark both state that they were told by the parents that the son had made no contributions within the two years immediately preceding his death. They prepared a written statement, which was signed by the father, from which statement we quote the following:

"He did not live with me except an occasional visit after he returned from the War. He always gave me some money to help out before that time but during the two years just past he did not contribute any to my support or my wife as he was sick most of the time and did not make much. He did not come home very often but my wife and I would see him in Monroe about once a week."

(signed) T. E. Edwards."

Then follows this sentence:

"The above statement is correct.

(signed) Mrs. M. M. Edwards."

The testimony shows that both Mr. and Mrs. Edwards are partially deaf and they say they have no recollection that the statement which they admit having signed was read over to them, and further, that if it was read to them, they did not hear and understand it. It is now contended that Villiva and Clark took advantage of these aged people and procured their sig-

natures to an instrument which does not set forth the facts, although both Villiva and Clark testified that the statement sets forth what was told them by Mr. and Mrs. Edwards.

Even if it be conceded, as it is now argued, that these representatives of the insurance company were disposed to take advantage of Mr. and Mrs. Edwards, the fact remains that they did say what the statement shows they said. Our conclusion does not rest alone upon the testimony of Villiva and Clark. Indeed, if their testimony be eliminated entirely, there is ample proof that they did make the statement. We quote the following from Mrs. Edwards' testimony found on page 13:

"Q. I want to ask you that if on the 11th day of October, 1927, about six days after your son died, if you didn't state to Mr. Villiva, this gentleman right here, and Mr. Clark, that Sullivan S. Edwards had been sick a great deal after he came out of the war and that he did not contribute anything to your support or to your husband's support during the last two years of his life?

"A. Yes, we did state that, but we had forgotten that he had given us some land in the last two years, and we sold that land and got cash for it. During the last two years of his life, we sold land and got the cash for it."

We quote also the following from Mr. Edwards' testimony found on pages 26 and 27 of the evidence in the record:

"Q. Did you not tell Mr. Villiva and Mr. Clark that your son had not contributed anything to your and your wife's support for about two years before his death?

"A. If I told them that I was just mistaken for the simple reason that I looked into my records and found afterwards that I received money from land sold of his in 1926 and 1927, yes, sir.

"Q. Did you tell them that?

"A. What?

"Q. That your son had not contributed anything to your support and that of your wife for about two years before his death.

"A. It was an oversight of mine if I told them that.

"Q. Did you tell them that?

"A. I don't remember whether I did or not. I was bothered at the time. I don't actually remember today whether I told them that or not, but if I did I was mistaken. I remember signing the paper all right, but I never knew what was in it."

We quote further the testimony of Mr. Edwards found on page 33:

"Q. Was that money that you got from the sale of land all that your son contributed to you during the last two years of his life?

"A. From the sale of land all I received was in money.

"Q. Yes, but was that all you got from your son during the last two years?

"A. Yes, sir."

It is, therefore, perfectly clear that the parents had received nothing whatever from the son for a period of at least two years prior to his death. As already stated, we do not attribute to these parents any desire or intent to misrepresent the facts when they stated on direct examination that the son had contributed to their support up to the date of his death. But it seems that they had fallen into the error of considering that whatever amounts they had received from the sale of land were contributions made to them by the son.

The facts about the land are that in 1906, twenty-one years before the son died, he and his father purchased some land for which they paid $250. Two years later, the son sold his interest in the land to the father and retained notes and a mortgage, and a short time thereafter gave the notes to his father and the mortgage was cancelled. The land became valuable, not only for timber, but for minerals, so that from 1907 to 1927 the father sold timber, mineral leases and land and from that source received $2875.00. Both the father and the mother considered all these amounts as contributions by the son. However, they

are not so in fact. The son owned no interest in the land after 1908 and had no interest in the revenues derived from it. The only donation which the son made to the father was of the notes for his one-half interest in the land, and that was nearly twenty years before the son's death.

We are referred to the case of Balthazar vs. Swift & Company, decided by the Court of Appeal for the Orleans Circuit, on March 4, 1929, and reported in 10 La. App. 25, 120 So. 896, where it was held that a parent in destitute circumstances at the time of a son's death was actually dependent within the meaning of the compensation acts in view of the legal duty of a child to maintain the parent in need, under Article 229 of the Civil Code, though the deceased child had never contributed anything to the support of the parent prior to his death.

That decision, if correct (and we question it), is not applicable under the law as it existed at the time plaintiffs' son was killed. He was killed in 1927 and the act then in force was No. 85 of 1926. The law applicable when the above cited opinion was rendered was Act 247 of 1920. Subdivision 2(n), Sec. 8 of that Act reads as follows:

"In all cases provided for in this section the relation of dependency must exist at the time of the injury and at the time of the death."

The corresponding provision of Act 85 of 1926 is Subdivision 2(I), Sec. 8, which reads as follows:

"In all cases provided for under this Section the relation or dependency must exist at the time of the accident and at the time of death and the mere expectation or hope of future contributions to the support of an alleged dependent by an employee, shall not constitute proof of dependency as a fact."

The judgment appealed from is correct and is accordingly affirmed.